## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **ESSEX TECHNOLOGY GROUP, LLC,**[1] | ) |
| | ) **Case No. 3:25-bk-00452 (NBK)** |
| Debtor. | ) |
| | ) |
| | ) |

## DECLARATION OF ROB HUBBARD IN SUPPORT OF
## THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Rob Hubbard, declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Essex Technology Group, LLC dba Bargain Hunt Stores, a Delaware limited liability company (the "<u>Debtor</u>" or the "<u>Company</u>").  While headquartered in Antioch, Tennessee, the Debtor operates 92 retail stores (the "<u>Stores</u>") across ten states, primarily in the Southeast.

2.      As the Chief Restructuring Officer ("<u>CRO</u>"), I have acquired extensive knowledge of the operations and financial condition of the Debtor, including, among other things: (a) all operations, restructuring activities and initiatives of the Debtor; (b) cash management and liquidity forecasting; and (c) engagement with creditors and other stakeholders.

3.      I am a managing director at Riveron and have over 20 years of executive leadership experience providing financial advisory, restructuring, and turnaround management to large and middle-market companies.  I have held the role of CRO in other bankruptcy cases.

4.      Except as otherwise indicated, I base all facts set forth in this declaration (this "<u>Declaration</u>") on my personal knowledge, my review of business records, information received

---

[1] The last four digits of the Debtor's federal tax identification number are 3377. The corporate headquarters and the mailing address for the Debtor is 3815 Logistics Way, Antioch, Tennessee 37013.

from the Company's management team and employees, and my opinion based on my experience, knowledge, and information concerning the Debtor's operational and financial condition. If called to testify, I could testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtor.

5.    On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee to facilitate the maximization of value of the Debtor's assets.

6.    I submit this Declaration to describe the Debtor's background and the circumstances that led to this chapter 11 case. I also submit this Declaration in support of the relief requested by the Debtor in the "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings").

7.    By the First Day Pleadings, the Debtor seeks to, among other things:

   **(a)**    allow for the use of cash collateral;

   **(b)**    allow the Debtor to assume its consulting agreement with Hilco Merchant Resources, LLC ("Hilco") and continue conducting store closing sales;

   **(c)**    allow for the continued payment of wage and tax obligations;

   **(d)**    authorize payment of certain tax obligations;

   **(e)**    ensure the continuation of the Debtor's cash management system without interruption;

   **(f)**    continue the Debtor's insurance programs;

   **(g)**    provide adequate assurance of payment to the Debtor's utility providers;

   **(h)**    extend certain deadlines for filing schedules of assets and liabilities and statements of financial affairs;

**(i)**      limit the notice parties in certain circumstances and establish notice procedures;

**(j)**      continue and honor the Debtor's customer programs;

**(k)**      authorize payment of certain prepetition shipping obligations in the ordinary course of business; and

**(l)**      set a hearing on the first day motions.

8.      I am familiar with each of the First Day Pleadings. Absent the relief requested in the First Day Pleadings, I believe that the Debtor would suffer immediate and irreparable harm that would jeopardize its ability to maximize value for creditors. I further believe that the First Day Pleadings reflect a thorough analysis by the Debtor's management team and the Debtor's professional advisors, and capture relief that is critical to the success of these proceedings.

9.      This Declaration is divided into three parts. Part I describes the Debtor's business, organizational structure, certain relevant corporate governance matters, and prepetition indebtedness. Part II describes the circumstances leading to the commencement of this chapter 11 case and the Debtor's plan for this case. Part III summarizes the First Day Pleadings and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the estate, as applicable.

## I.   DESCRIPTION OF THE DEBTOR

### A. The Debtor's Business

10.      The Company specializes in closeout and reverse logistics inventory processing. It purchases and resells goods from manufacturers and carries fast moving goods such as household goods, packaged foods, and similar general store products. It previously processed customer merchandise returns from vendors and sold the returned merchandise through wholesale channels and online websites. The Company has 92 retail stores located in Alabama, Arkansas, Georgia, Indiana, Kentucky, Mississippi, North Carolina, Ohio, South Carolina, and Tennessee. The

Company had net sales of approximately $340 million for the fiscal year ending February 3, 2024, and approximately $274 million for the ten months ended November 30, 2024.

**B.  Formation and Organizational Structure**

11.     The Debtor is a successor in interest to Essex Technology Group, Inc. ("Essex"), which was a Tennessee corporation. Effective November 17, 2015, that company was merged with and into Essex Merger Sub, Inc., a Tennessee corporation.  Subsequent to that merger, effective November 18, 2015, Essex was converted to a Delaware limited liability company with its current name Essex Technology Group, LLC.

12.     ETGBH Holdings, LLC ("Holdings") is the sole member of the Debtor.  A chart illustrating the Debtor's organizational structure (including non-Debtor affiliates) is set forth below:



**C.  Equity Ownership and Corporate Governance**

13.     Bargain Holdings, L.L.C. is majority owned by ACON BH Investors, L.L.C.

("ACON"). On January 13, 2025, Crystal Financial LLC dba SLR Credit Solutions ("SLR"), in its capacity as administrative agent to the Debtor's senior secured lenders (the "Prepetition Agent"), exercised certain proxy rights under a Pledge and Security Agreement (the "Proxy Action"), which resulted in the following: (a) Prepetition Agent, as proxy and attorney-in-fact for Holdings, executed an amended and restated Limited Liability Company Agreement for the Debtor (the "LLC Agreement"); (b) Holdings' membership interests in the Debtor were converted to non-voting membership interests; and (c) Crystal Financial SPV II LLC ("Crystal") acquired all voting rights related to the Debtor's equity and elected Matthew Kahn, an independent director, as the sole Manager of the Debtor (the "Independent Manager"). Accordingly, ACON remains the indirect economic equity holder of the Debtor, but day-to-day control of the Debtor is vested in the Independent Manager.

### D. Prepetition Debt

14. The Debtor is party to a certain Credit Agreement, dated August 18, 2023, as amended by the First Amendment to Credit Agreement, dated May 15, 2024, and the Second Amendment and Limited Consent to Credit Agreement, dated September 1, 2024 (the "Prepetition Credit Agreement") by and among the Debtor, as a borrower; Holdings, as guarantor; the lenders party thereto from time to time, and Prepetition Agent, as administrative agent (the Prepetition Agent and such lenders together, the "Prepetition Secured Parties"). Pursuant to the Prepetition Credit Agreement and related loan documents, the Prepetition Secured Parties provided revolving loans, term loans, and other financial accommodations to the Debtor and its affiliates in the original principal amount of $40 million. The Debtor's obligations to the Prepetition Secured Parties are secured by a first lien on substantially all of the Debtor's assets. As of the Petition Date, the Debtor was indebted to the Prepetition Secured Parties in an aggregate principal amount of not less than $16.9 million.

15.     The Debtor is also party to a certain Subordinated Secured Promissory Note (the Subordinated Note") dated August 18, 2023, by and among the Debtor, as obligor, Holdings, as guarantor, and ACON BH Investors I, L.L.C. (the "Junior Prepetition Secured Party").  The Debtor's obligations to the Junior Prepetition Secured Party are secured by a lien on substantially all of the Debtor's assets, which lien is subordinated to the liens of the Prepetition Secured Parties. The Subordinated Note was in the original principal amount of $2,577,090.99, and as of the Petition Date, the Debtor was indebted to the Junior Prepetition Secured Party in the amount of approximately $3.0 million.

16.     Another prepetition document relevant to the Debtor's secured debt obligations is that certain Irrevocable Standby Letter of Credit No. HACH697633OS in the amount of $7.0 million (the "Letter of Credit"), issued by BMO Harris Bank, N.A. (the "L/C Issuer") for the benefit of the Prepetition Agent, as beneficiary, with ACON Equity Partners IV, L.P. (the "ACON IV"), as the applicant.  The Letter of Credit was drawn by the Prepetition Agent prior to the Petition Date, and upon payment by the L/C Issuer and application of the proceeds to the obligations under the Prepetition Credit Agreement, the Debtor's outstanding obligations to the Prepetition Secured Parties will be reduced by $7.0 million, which, could in turn, upon the L/C Issuer being reimbursed by ACON IV and certain other conditions, entitle ACON IV to assert subrogation claims against the Debtor.  The right to do so is suspended or waived, however, until the Secured Obligations (as defined in the Cash Collateral Orders (which are defined herein)) of the Prepetition Secured Parties are paid in full.

## II.     EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

17.     The Company does business in an extremely competitive environment.  Bargain stores compete with many different retail channels, from big box stores with many billions of dollars of capital to local convenience stores and everything in between.  E-commerce companies

are also significant sources of competition. Other macroeconomic factors that have affected the Company are increased interest rates, inflationary pressures, and supply chain matters.

18. The Company has not been profitable in recent years. The Company has a fiscal year end on the Saturday closest to February 1. For the fiscal years ended January 28, 2023, and February 4, 2024, respectively, the Company had net losses of approximately $25.4 million and $21.8 million respectively. For the ten months ended November 30, 2024, the Company had a net loss of approximately $19.0 million.

19. As stated above, in addition to its retail operations, the Company had a reverse logistics wholesale business. This was the more profitable business. Amazon.com ("Amazon") was the Company's largest supplier, providing customer returns for the Company for its wholesale business. In 2024, Amazon sought requests for proposal for much of its reverse logistics business, including its business with the Company. As a result of that RFP process, the Company lost approximately 25% of its business with Amazon, which had a significant negative effect on the Debtor's business. The Debtor was unable to keep current with Amazon, which eventually terminated its relationship, functionally terminating the Company's wholesale business.

20. The Company engaged in discussions with ACON and with the Prepetition Agent on behalf of the Prepetition Secured Parties, including with respect to an additional equity investment by ACON into the Company, but ultimately those discussions were not successful leaving the Company with insufficient liquidity to continue normal operations. On January 13, 2025, after numerous events of default under the Prepetition Credit Agreement and in the absence of a consensual path forward with ACON, the Prepetition Agent took the Proxy Action. After that, the Independent Manager, with the advice of the Company's professionals, reviewed possible restructuring options and determined that the current chapter 11 filing and process was in the best

interests of the Debtor and its stakeholders.

21.     The Debtor has initiated this chapter 11 case to maximize the value of its assets for the benefit of its stakeholders.  As set forth below, the Debtor has filed contemporaneously with this Declaration a store liquidation motion to continue store liquidation sales that began prior to the Petition Date, and it intends shortly to file an application to engage its investment banker.  In summary, the Debtor believes that in the absence of a stalking horse buyer for a going concern sale, which it does not currently have, an immediate liquidation of its assets through its retail stores is the only way to maximize value.  However, the Debtor remains open to the possibility of a going concern sale and has been working with its advisors on a parallel path with the liquidation process.

**III.     SUMMARY OF THE FIRST DAY PLEADINGS[2]**

22.     Concurrently with the filing of this chapter 11 case, the Debtor has filed the First Day Pleadings.  Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtor would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtor's efforts to prosecute a value-maximizing sale process and conduct this case efficiently, thus permitting the Debtor to preserve and maximize value for the benefit of all stakeholders.

23.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am told by the Debtor's legal advisors that Rule 6003 of the Federal Rule of Bankruptcy Procedure provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this exception, the Debtor

---

[2] Capitalized, but otherwise undefined, terms used in this Section III shall have the meanings ascribed to such terms in the applicable First Day Pleading.

has limited its requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein. With respect to the other First Day Pleadings, set forth below are the reasons why I believe it is imperative that the Court grant the relief requested.

> **A.** **Expedited Motion of Debtor for Interim and Final Orders (i) Authorizing the Debtor to Use Cash Collateral; (ii) Granting Adequate Protection to Prepetition Secured Parties; (iii) Modifying the Automatic Stay; (iv) Scheduling Final Hearing; and (v) Granting Related Relief (the "<u>Cash Collateral Motion</u>")**

24.     As set forth in herein, as of the Petition Date, the Debtor's prepetition capital structure includes obligations incurred pursuant to the Prepetition Credit Agreement with the Prepetition Secured Parties.

25.     As of the Petition Date, the Debtor was indebted to the Prepetition Secured Parties under the Prepetition Credit Agreement in an aggregate principal amount of not less than $16.9 million.

26.     The obligations of the Debtor under the Prepetition Credit Agreement are secured by substantially all of the Debtor's assets, including: accounts receivable, inventory, cash, and other personal property.

27.     As of the Petition Date, the Prepetition Secured Parties were fully secured by valid, perfected, enforceable, and non-avoidable first-priority security interests and liens (the "<u>Prepetition Liens</u>") on all "Collateral" as defined in the Prepetition Credit Agreement, including all assets of the Debtor (the "<u>Prepetition Collateral</u>").

28.     As described in greater detail herein, the Debtor believes that the commencement of this chapter 11 case and the implementation of an orderly sale process, under the supervision of

this Court, will permit the Debtor to maximize the value of its estate for all creditors and parties in interest.

29.     The Debtor requires use of cash collateral to among other things, pay the costs and expenses associated with administering this chapter 11 case, continue the orderly operation of the Debtor's business, maximize and preserve the Debtor's going concern value, make payroll and satisfy other working capital and general corporate purposes.   To that end, the Debtor has contemporaneously filed the Cash Collateral Motion seeking interim and final orders (together, the "Cash Collateral Orders") authorizing the use of cash collateral.  Without the continued use of Cash Collateral (as defined in the Cash Collateral Motion), the Debtor and its estate would suffer immediate and irreparable harm.  The Debtor does not have sufficient available sources of working capital and financing to operate its business in the ordinary course of business without the authorized use of Cash Collateral.

30.     As CRO, I, along with other employees of Riveron, assisted the Debtor to determine projected cash needs and prepared projections (the "Approved Budget") of postpetition cash needs of the Debtor's business in the initial 13 weeks of this chapter 11 case.  In doing so, I became familiar with these cash flow forecasts, as prepared by the Debtor's management and Riveron. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with operating in this chapter 11 case, customer and vendor relationships, the store closing sale process, and required operational payments.   Based on discussions with management, I understand that the Debtor believes that the Approved Budget provides an accurate reflection of the Debtor's liquidity requirements over the identified period and is reasonable and appropriate under the circumstances.

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document    Page 10 of 41

31.     The Approved Budget demonstrates that during the initial four-week period after the filing of this chapter 11 case (the "Interim Period"), the Debtor anticipates that it will collect approximately $26.7 million in cash.  The Approved Budget also sets forth the weekly expenditures required by the Debtor and projects cash disbursements totaling approximately $9.4 million in operating disbursements during the Interim Period.  The bulk of these disbursements represents payments related to payroll and other employee-related obligations, utilities, and other expenses necessary for the Debtor's continued ability to maintain postpetition operations.  The Approved Budget demonstrates the Debtor's need for use of Cash Collateral during the Interim Period. The Debtor believes that it can operate its business during the Interim Period using Cash Collateral alone.

32.     In return for the consensual use of Cash Collateral, the Debtor proposes to provide the Prepetition Secured Parties with adequate protection to protect against the postpetition diminution in value of the Prepetition Secured Parties' collateral resulting from use of the Cash Collateral by the Debtor and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations") in the following forms:

    **(a)**  provide superpriority claim status; and

    **(b)**  provide for adequate protection replacement liens on the Prepetition Collateral, junior only to certain permitted liens and carve-out, and liens on all other Collateral including, subject to the entry of a final order, proceeds of avoidance actions.

33.     In addition, the Secured Obligations (as defined in the Cash Collateral Motion) shall continue to accrue and shall be paid in cash at the applicable default contract rate of interest through this chapter 11 case in accordance with the Prepetition Loan Documents (as defined in the

Cash Collateral Motion), until the Secured Obligations are indefeasibly paid in full and the Debtor will pay for the fees and expenses of the Prepetition Agent and its advisors.

34.     I submit that the proposed Adequate Protection Obligations are fair and reasonable, and should fully and adequately protect the Prepetition Secured Parties from any diminution in the value of their interest in the Collateral.  However, the Cash Collateral Order does not prejudice the rights of the Prepetition Agent or the Prepetition Secured Parties to seek additional adequate protection.

35.     The use of Cash Collateral according to the Approved Budget is expected to provide the Debtor with the liquidity necessary to fund its operations during the critical transition into chapter 11.  Without the immediate use of Cash Collateral, the Debtor will have no ability to continue to operate its business and pay all the necessary administrative expenses required to remain in chapter 11.  The Debtor will not be able to pay its vendors.  The Debtor will not be able to fund payroll.  The Debtor will not be able to pay professionals necessary for the administration of this chapter 11 case and the successful sale of the business, as contemplated.  All of these outcomes will cause immediate and irreparable harm to the Debtor's estate.

36.     On information and belief, the Prepetition Secured Parties have consented to the Debtor's use of Cash Collateral on the terms and conditions, and subject to the Adequate Protection Obligations, set forth in the Cash Collateral Orders.

37.     Accordingly, for the reasons stated herein and in the Cash Collateral Motion, I believe the requested use of Cash Collateral is appropriate and the Cash Collateral Motion should be approved.

      **B.**      **Expedited Motion of Debtor for Entry of Interim and Final Orders (i) Authorizing the Debtor to Assume Consulting Agreement Related to Store Closing Sales, (ii) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and**

**Encumbrances, (iii) Authorizing and Approving Store Closing Procedures, (iv) Authorizing Customary Bonuses for Non-Insider Employees of Stores, and (v) Granting Related Relief (the "<u>Store Closing Motion</u>")**

38.     Pursuant to the Store Closing Motion, the Debtor seeks: (a) authority to assume that certain Consulting Agreement dated as of January 26, 2025 (the "<u>Consulting Agreement</u>"), with Hilco, which is attached as Schedule I to Exhibit A of the Store Closing Motion; (b) the continuation of store closings or similar themed sales (the "<u>Store Closing Sales</u>") commenced prepetition by the Debtor at the Stores listed on Schedule 2 of Exhibit A of the Store Closing Motion; (c) authority to provide customary, small bonuses to non-insider Closing Store Employees (the "<u>Store Closing Bonuses</u>"); (d) approval for the terms of the store closing procedures (the "<u>Store Closing Procedures</u>"), which are attached as Schedule 3 to Exhibit A of the Store Closing Motion; and (e) related relief.

39.     As set forth above, while the Debtor is hopeful that the postpetition marketing process will result in actionable proposals, including for the Stores, it also recognizes the challenges of selling the Stores to one or more going-concern buyers.  Thus, in order to avoid further losses and administrative costs, including continuing to pay rent for these Stores, which could amount to as much as $1.8 million for March 2025 alone, the Debtor commenced Store Closing Sales on January 30, 2025, and seeks to continue them during the Debtor's chapter 11 case.  Doing so will allow the Debtor to unequivocally surrender possession of the Stores to subject landlord counterparties on or before February 28, 2025.

40.     The Debtor believes that the terms set forth in the Consulting Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the Store Closing Sales and will maximize value for all interested parties.  Prior to entering into the Consulting Agreement, the Debtor determined, after discussions with its advisors and negotiations with Hilco, that the terms of that Consulting Agreement, as a whole, are at or better than market

Case 3:25-bk-00452   Doc 22   Filed 02/03/25   Entered 02/03/25 21:08:40   Desc Main
Document    Page 13 of 41

terms for such types of contracts. The material terms of the Consulting Agreement are set forth in the Store Closing Motion. Hilco has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closing Sales in an efficient and cost-effective manner.

41. The Debtor concluded in its business judgment that: (a) the services of Hilco are necessary (i) for a seamless and efficient large-scale store closing process, as the Debtor contemplates, and (ii) to maximize the value of the saleable Merchandise and FF&E (each as defined in the Consulting Agreement, and together, the "Store Closure Assets"); (b) Hilco is qualified and capable of performing the required tasks in a value-maximizing manner; and (c) replacing or not continuing with Hilco, as Agent, would significantly disrupt the Debtor's process and impair the value of the remaining Store Closure Assets.

42. Assumption of the Consulting Agreement will enable the Debtor to utilize the skills and resources of Hilco to efficiently conduct the Store Closing Sales for the benefit of all stakeholders. If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closing Sales—which commenced a few days prior to the Petition Date—would lose the ongoing benefit of Hilco's oversight and might be delayed or suspended entirely, leading to significant harm to the Debtor, including a loss of additional liquidity and increased administrative expenses. Accordingly, the Debtor submits that assumption of the Consulting Agreement is beneficial to the Debtor's estate, and, therefore, a reasonable exercise of the Debtor's business judgment.

43. The Debtor also seeks approval of streamlined Store Closing Procedures to effectuate the sale of the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances. The Debtor has determined, in the exercise of its business judgment and in

consultation with its advisors, that the Store Closing Procedures provide the best and most efficient means of liquidating the Store Closure Assets and closing the Stores.

44. Certain states in which the Debtor operates stores have or may have laws, as more fully set forth in the Store Closing Motion, that would impede the Debtor's ability to maximize value through the Store Closing Sales. Accordingly the Debtor requests a waiver of these applicable state laws to the extent they conflict with the ability of the Debtor to complete the Store Closings.

45. To facilitate the orderly resolution of any disputes between the Debtor and any Governmental Units arising due to the Store Closing Procedures and the alleged applicability of any applicable state laws, the Debtor respectfully requests that the Court authorize the Debtor to implement the Dispute Resolution Procedures described in the Store Closing Motion. To be clear, the Debtor intends to (a) pay its terminated employees as expeditiously as possible and under normal payment procedures; and (b) comply with state and local health and safety laws and consumer protection laws while conducting the Store Closing Sales.

46. The Debtor may determine that the cost associated with holding or selling certain Store Closure Assets present in the Stores exceeds the proceeds that will be realized from its sale, or such property may not be saleable at all. In such cases, retaining the property would be burdensome to the estate and the property would be of inconsequential value.[3] The Debtor believes that abandonment of such property is in the best interests of its estate and requests

---

[3] For the avoidance of doubt, the Debtor will not sell any personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) as part of the Store Closing Sales, and all personal identifying information will be removed from any FF&E prior to abandonment of same.

authority to abandon such property where it determines in its business judgment that abandonment is the appropriate course of action.

47. The Debtor also requests authority to pay Store Closing Bonuses as more specifically described in the Store Closing Motion. Store Closing Bonuses will be made exclusively to non-insiders on the condition of employment through the date on which the respective employee's store closes. The Debtor anticipates that approximately 376 non-insider employees would be eligible for Store Closing Bonuses. The total aggregate amount of Store Closing Bonuses will not exceed $337,303, with the final amount dependent on, among other things, whether eligible employees remain employed for the duration of the Closing Sales. The Debtor does not anticipate paying any individual more than $2,000 on account of a Store Closing Bonus. The Debtor believes that the Store Closing Bonus Plan, which, in my experience, is customary for going out of business sales, is critical to ensuring that eligible employees, who will eventually be affected by the Store Closing Sales, continue to provide critical services to the Debtor during the Store Closing process.

48. Accordingly, for the reasons stated herein and in the Store Closing Motion, I believe the requested relief is appropriate and the Store Closing Motion should be approved.

**C.  Expedited Motion of Debtor for an Order (i) Authorizing the Debtor to (a) Pay Certain Prepetition Employee Obligations and Related Claims and (b) Continue to Provide Employee Benefits in the Ordinary Course of Business and (ii) Granting Other Related Relief (the "<u>Wages Motion</u>")**

49. Pursuant to the Wages Motion, the Debtor seeks, among other things: (a) authority to pay certain prepetition wages, salaries, and other compensation, taxes and withholdings, and certain other employee benefit program expenses; (b) to honor and continue benefit programs for employees; and (c) related relief.

50. As of the Petition Date, the Debtor employs approximately 1,650 employees

(collectively, the "Employees"), of which approximately 510 are full-time Employees, 1,136 are part-time Employees, and 4 are seasonal Employees.

51.     The Employees are integral to the Debtor's operations.  They perform a wide variety of functions critical to the Debtor's ordinary course operations.  The Debtor has designed its compensation programs to attract, retain, and motivate its employees.  The efforts of these Employees will ensure a smooth transition into chapter 11 and help maximize of the value of the Debtor's estate.

52.     The Debtor maintains the following compensation and benefits programs and pays various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Payroll Processing Fees;
- Withholding Obligations;
- Health Programs;
- Life Insurance;
- Workers' Compensation Program;
- 401(k) Plan;
- Paid Time Off;
- Reimbursable Expenses;
- Employee Discount; and
- Non-Insider Severance Program.

53.     Subject to the Court's approval, the Debtor intends to continue its Employee Compensation and Benefits Programs in the ordinary course, including honoring prepetition obligations due thereunder.  The Debtor further requests confirmation of its right to modify, change, and discontinue any of its Employee Compensation and Benefits Programs and to implement new programs, policies, and benefits in the ordinary course of business during this

chapter 11 case, in each case, in the Debtor's discretion and without the need for further Court approval, subject to: (a) other orders entered in this chapter 11 case, (b) any agreements executed in contemplation of this chapter 11 case, and (c) the requirements of the Bankruptcy Code, and in each case in consultation with the Office of the U.S. Trustee and the Prepetition Agent.

54. Specifically, in the Wages Motion, the Debtor seeks authority, but not direction, to pay or honor up to the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Program:

| Prepetition Employee Obligations | Amount |
|---|---|
| Employee Compensation | $660,000 |
| Withholding Obligations and Payroll Taxes | $190,000 |
| Health Programs | $40,000 |
| Life Insurance | $1,000 |
| Workers' Compensation Programs | $26,000 |
| 401(k) Plan | $9,000 |
| Paid Time Off | $30,000 |
| Reimbursable Expenses | $0 |
| Employee Discount | $0 |
| Non-Insider Severance Program | $0 |
| **Total** | **$956,000** |

55. The Debtor does not believe that any prepetition amounts owed to any Employees on account of the Employee programs exceeds $15,150, and do not seek authority to pay any Employee in an amount exceeding $15,150 on account of prepetition claims.

56. Upon information and belief, the vast majority of Employees rely exclusively or primarily on the Employee Compensation and Benefit Programs to pay their daily living expenses and support themselves or their families. I believe that any delay in payments to the Employees could cause the Debtor to lose the benefit of their services, which would jeopardize the Debtor's restructuring and sale process, and lead to a rapid deterioration in the value of the business. Moreover, Employees will face significant financial consequences if the Debtor cannot continue such programs in the ordinary course of business. Therefore, I believe that the relief requested in

the Wages Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable to the Debtor to continue operating its business during chapter 11 without disruption to maximize the value of its assets.

57.     Accordingly, for the reasons stated herein and in the Wages Motion, I believe the requested relief is appropriate and the Wages Motion should be approved.

> **D.     Expedited Motion of Debtor for Entry of an Order (i) Authorizing the Debtor to Pay Certain Prepetition Taxes and Related Obligations and (ii) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Prepetition Taxes and Related Obligations (the "Taxes Motion")**

58.     Pursuant to the Taxes Motion, the Debtor seeks, among other things, authority to pay certain prepetition taxes and related relief.

59.     In the ordinary course of business, the Debtor is subject to various taxes (including sales taxes), regulatory fees and assessments, and related obligations (collectively, the "Taxes") that are payable directly to numerous taxing authorities (collectively, the Taxing Authorities"). The Debtor is seeking authority (but not direction) to pay various unpaid taxes, fees, and related obligations that accrued or assessed before the Petition Date.  The tax obligations described herein are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments except with respect to certain trust fund tax obligations.

> **(a)     Business Taxes**

60.     The Debtor is required to make payments to certain Taxing Authorities that consist of various *de minimis* registration fees and other filing fees (collectively, the "Business Taxes") for the right to exist as a domestic limited liability company, for the privilege of doing business in the state as a foreign limited liability company, or for the actual conduct or carrying on of business in the state.  The Debtor estimates that, as of the Petition Date, a *de minimis* amount of Business Taxes are accrued and unpaid, and the Debtor seeks authority, but not direction, to pay any

Business Taxes that come due during this chapter 11 case, whether or not attributable to the prepetition period.

### (b) Sales and Use Taxes

61. In the ordinary course of business, the Debtor incurs, collects, and remits to relevant Taxing Authorities sales and use taxes (including interest and penalties on any late payments, collectively, the "Sales and Use Taxes"). In some jurisdictions, the Debtor remits to relevant Taxing Authorities estimated amounts with respect to Sales and Use Taxes, resulting in tax credits or overpayments that may be refunded to the Debtor in certain circumstances. When Sales and Use Taxes are incurred at the point of purchase, vendors frequently include the applicable Sales and Use Taxes on the invoices payable by the Debtor. The process by which the Debtor remits Sales and Use Taxes varies depending on the particular jurisdiction and Taxing Authority. The Debtor generally accrues Sales and Use Taxes monthly and remit such taxes either monthly, quarterly, or annually

62. The Debtor estimates that it has incurred or collected approximately $1,200,000 in Sales and Use Taxes that have not been remitted to the relevant Taxing Authorities.[4] The Debtor requests authority, but not the direction, to satisfy any amounts owed on account of such Sales and Use Taxes that are due and owing as of the Petition Date or may become due and owing in the ordinary course of business during this chapter 11 case.

### (c) Personal Property Taxes

63. In the ordinary course of business, certain Taxing Authorities in jurisdictions where

---

[4] Certain Taxing Authorities may require the Debtor to remit outstanding Sales and Use Taxes to third-party vendors that in turn remit such Sales and Use Taxes to the applicable Taxing Authorities on behalf of the Debtor. For the avoidance of doubt, the Debtor requests authority herein, but not the direction, to remit such Sales and Use Taxes to the applicable third-party vendors to then in turn remit Sales and Use Taxes to the applicable Taxing Authorities on behalf of the Debtor.

the Debtor's operations are located levy personal property taxes against the Debtor's tangible personal property (collectively, the "Personal Property Taxes"). The Debtor seeks authority, but not direction, to pay any Personal Property Taxes that come due during this chapter 11 case, whether or not attributable to the prepetition period, subject to an aggregate maximum of $280,000.

### (d) Regulatory and Licensing Fees

64. In the ordinary course of business, the Debtor incurs certain escheat and unclaimed property, regulatory assessments, permitting, licensing, and other operational taxes and fees, including fees related to certain regulations, and other miscellaneous taxes and fees (collectively, "Regulatory and Other Taxes and Fees"). The Debtor generally remits Regulatory and Other Taxes and Fees to the relevant Taxing Authorities on an annual basis. The Debtor believes that it is substantially current on its obligations with respect to Regulatory and Other Taxes and Fees. However, out of an abundance of caution, the Debtor requests authority, but not direction, to pay Regulatory and Other Taxes and Fees that are due or become due and payable during this chapter 11 case, whether such Regulatory and Other Taxes and Fees relate to the pre or postpetition period, subject to an aggregate maximum of $350,000.

65. Any regulatory dispute or tax delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's restructuring process. Moreover, some Taxing Authorities could initiate an audit of the Debtor if the Taxes are not paid on time. Such audits would unnecessarily divert the Debtor's attention away from this chapter 11 case and result in unnecessary expenses. If the Taxing Authorities were to take any disruptive actions, such as lien filings or seeking relief from the automatic stay, it would consume valuable time and resources and divert the Debtor's attention from its business operations and sale efforts and materially and immediately harm the estate.

66. As such, the Debtor's failure to pay the Taxes could have a material adverse impact

on the Debtor's ability to maximize the value of its assets for the benefit of all stakeholders. Even if the Debtor could avoid payment of certain Taxes, I believe that the collateral consequences on the business would vastly exceed whatever modest short-run cost savings the Debtor might achieve. Additionally, any attempt to collect the Taxes from the Debtor's managers and officers has the potential to divert the attention of those individuals away from the Debtor's efforts to maximize the value of its assets through the postpetition sale process.

67.     Accordingly, for the reasons stated herein and in the Taxes Motion, I believe the requested relief is appropriate and the Taxes Motion should be approved.

> **E.**     **Expedited Motion of Debtor for Entry of an Order (i) Approving Continued Use of Cash Management System; (ii) Authorizing Debtor to Open and Close Bank Accounts; (iii) Authorizing Banks to Honor Certain Transfers; and (iv) Granting Related Relief (the "Cash Management Motion")**

68.     Pursuant to the Cash Management Motion, the Debtor seeks, among other things: authorization for the Debtor to (a) continue to operate its Cash Management System as it was operated prior to the Petition Date, (b) maintain its Bank Accounts, (c) honor certain prepetition obligations related thereto, (d) allow the Debtor to print or stamp "Debtor-in-Possession" on its existing checks, and (e) waiving the requirements of section 345(b) of the Bankruptcy Code.

69.     As described in greater detail in the Cash Management Motion, the Debtor maintains the Cash Management System in the ordinary course of its operations. The Cash Management System includes seven (7) Bank Accounts maintained at Truist Bank ("Truist Bank"), Fifth Third Bank ("Fifth Third"), Regions Bank ("Regions Bank"), and US Bank ("US Bank", and collectively with Truist Bank, Fifth Third, and Regions Bank, the "Banks").[5] The

---

[5] Upon information and belief, the Banks, each a well-capitalized, highly rated bank insured by the Federal Deposit Insurance Corporation, are each party to a Uniform Depository Agreement with the Office of the United States Trustee for Region 8.

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document    Page 22 of 41

Debtor is the account holder for all seven Bank Accounts. In the ordinary course of business, the Debtor utilizes the Bank Accounts to manage store deposits, make disbursements, including payroll, vendor payments and other operating payments, and to hold cash. The principal source of revenue for the Debtor is payments from its retail customers. The Bank Accounts at Fifth Third, Regions Bank, and US Bank are used for store deposits where Truist Bank is not available.

70.     Stores are assigned a physical regional bank based upon their proximity to one of the Banks at which the Debtor maintains accounts. Stores will make separate deposits for each business day and will deposit them to the assigned Bank Account. The Debtor does not utilize any lockboxes.

71.     The following is a more detailed description as to how the Cash Management System works:

a.     Truist Bank Account (x8713): This account is the Debtor's primary collections account for daily deposits by the Debtor's merchant processors, wholesale customer payments, transfers from regional banks, and for stores with a local branch. Credit card remittances are also deposited daily by the Debtor's merchant processors into this account. Funds are then swept daily to an account of the Prepetition Agent and returned to the Truist Bank account ending x7404 as necessary to fund ongoing operating expenses on a consensual basis with the Prepetition Agent. As noted below, twice a week, on Tuesdays and Fridays, amounts held in Fifth Third Bank, Regions Bank, and US Bank, are automatically swept to the Truist Bank account ending in x8713, leaving only a nominal amount in the account to cover bank fees.

b.      Truist Bank Account (x3035): This account is the main operating account that funds the Trust Bank account ending x6402 and is used to make disbursements. This account is funded by the Prepetition Agent.

c.      Truist Bank Account (x6402): This account is used to write checks. It is a zero-balance account that is funded daily by the Trust Bank account ending x3035.

d.      Truist Bank Account (x7404): This account is a disbursement account that is funded by the Prepetition Agent. This account is currently the primary disbursement account used to fund all of the Debtor's ongoing operating expenses.

e.      Fifth Third Bank Account (x9591): This account is utilized on a regional basis for stores located in Fifth Third's geographic area to make deposits. The funds in this account are swept to account x8713 on Tuesdays and Fridays, only leaving a nominal amount in the account to cover bank fees.

f.      Regions Bank Account (x3493): This account is utilized on a regional basis for stores located in Regions Bank's geographic area to make deposits. The funds in this account are swept to account x8713 on Tuesdays and Fridays, only leaving a nominal amount in the account to cover bank fees.

g.      US Bank Account (x6999): This account is utilized on a regional basis for stores located in US Bank's geographic area to make deposits. The funds in this account are swept to account x8713 on Tuesdays and Fridays, only leaving a nominal amount in the account to cover bank fees.

72.     The Cash Management System allows the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment

information.

73.     In order to draw a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims, the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts for which the signature cards shall indicate that the debtor is a "Chapter 11 Debtor-in-Possession"; (b) establish a new payroll account; and (c) maintain any funds in excess of the amount required for current operations in an interest-bearing account.

74.     The Debtor's Cash Management System constitutes a customary and essential business practice, and it is similar to those commonly employed by entities of comparable size and complexity.  The Cash Management System allows the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.  Without continued use of these accounts, the Debtor could experience significant disruption in its cash receipts from customers, which would cause interruption of payments to vendors or employees, and other cash transactions that happen on a daily basis.

75.     The Banks charge the Debtor ACH fees and monthly maintenance fees (collectively, the "Bank Fees").  The Debtor pays approximately $39,000 in Bank Fees on a monthly basis.  In addition, the Banks charge the Debtor, on average, approximately $295,000 per month, in processing fees for credit card transactions (the "Transaction Fees" and, together with the Bank Fees, the "Service Charges").  If the Debtor fails to pay the Service Charges, the Banks may refuse to continue working with the Debtor, which would cause immediate and possibly irreparable harm.  Therefore, the Debtor requests authority to continue to pay the Service Charges

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document        Page 25 of 41

and all other ordinary course fees and service charges in accordance with any agreements governing the Bank Accounts, whether arising before or after the Petition Date, on the terms set forth in the proposed orders attached hereto.

76.     In the ordinary course of business, the Debtor uses its Business Forms to purchase goods and supplies from vendors and otherwise conduct business. The Debtor requests authority to continue using the Business Forms without alteration, change, and a designation as a "Debtor in Possession" to avoid a significant and unwarranted expense. However, after the Debtor depletes its current Business Forms, the Debtor will replace such forms with those containing the "Debtor in Possession" designation in accordance with Local Rules. To the extent that the Debtor prints any new checks, it will include the designation "Debtor in Possession" and this case number.

77.     I believe that the Cash Management System constitutes a customary and essential business practice, and it is similar to those commonly employed by entities of comparable size and complexity. The Debtor's continued use of the Cash Management System is critical to a successful chapter 11 process and a seamless transition to operation as debtor in possession. Without the continued use of the Cash Management System, the Debtor could experience significant disruption in its receipts from customers, which would cause interruption of payments to vendors and other cash transactions that happen on a daily basis. This would cause irreparable harm to the Debtor's business and could interfere with the Debtor's ability to consummate a successful reorganization.

78.     Accordingly, for the reasons stated herein and in the Cash Management Motion, I believe the requested relief is appropriate and the Cash Management Motion should be approved.

**F.** **Expedited Motion of Debtor for Entry of an Order Authorizing Debtor to (i) Continue the Debtor's Insurance Program, (ii) Continue to Finance Insurance Agreements, and (iii) Pay All Prepetition and Postpetition Obligations With Respect Thereto; (iv) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Insurance Obligations (the "Insurance Motion")**

79. Pursuant to the Insurance Motion, the Debtor seeks, among other things, (a) authority, but not direction, for the Debtor, in its sole discretion, to (i) continue its insurance program, including the insurance premium finance agreements, and honor prepetition and postpetition obligations with respect thereto; and (ii) renew, supplement, modify, extend, terminate, or purchase insurance coverage (including through obtaining "tail" coverage) and finance insurance premiums in the ordinary course of business; (b) authority and direction for applicable banks and financial institutions to honor and process checks and transfers related to such insurance obligations; and (c) related relief.

80. The Debtor's insurance program (the "Insurance Program") is comprised of commercial insurance policies maintained by the Debtor (each, a "Commercial Insurance Policy" and, collectively, the "Commercial Insurance Policies"), that are administered through various insurers (the "Insurers") and which provide coverage for, among other things, general liability, workers compensation, automobile, cyber liability, director and officer liability, management liability, property, and professional liability. The Insurance Program includes the Premium Finance Agreement, as defined and described below.

81. For the 2024-2025 policy period, the Debtor will incur approximately $575,000 in annual premiums relating to the Commercial Insurance Policies, including associated fees and taxes. The Debtor has diligently reviewed its records and believes that there are no outstanding amounts owed in premiums to its Insurers under the Commercial Insurance Policies as of the Petition Date (other than those premiums that are financed, as further explained below).

82. The nature and extent of the Debtor's business operations make it essential to maintain its Insurance Program on an uninterrupted basis. Moreover, the Debtor is required to maintain insurance coverage, like the coverage provided in the Insurance Program, under the U.S. Trustee's Operating Guidelines, the laws of the various states in which the Debtor operates, applicable federal law, and certain of the Debtor's contracts and leases.

83. Therefore, the Debtor's maintenance of its relationships with the Insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods. Further, there may be prepetition amounts due and owing to the Insurers of which the Debtor is unaware; for example, if audits are conducted after the Petition Date.

84. Non-payment of the Insurance Obligations could result in cancellation of the Insurance Program, and the Debtor may be unable to find alternative insurance coverage, or find such alternatives only at a much higher cost than the Debtor currently incurs. If the Commercial Insurance Policies lapse without renewal, the Debtor could be exposed to substantial liability for personal and/or property damages to the detriment of all stakeholders. In addition, the Debtor would be in default under the U.S. Trustee requirements, certain key contracts, and applicable law, all of which require that the Debtor maintain adequate insurance coverage. Consequently, if the Debtor's Commercial Insurance Policies lapsed, the Debtor would be required to obtain replacement coverage on an emergency basis and, likely, at significant expense. Therefore, the continuation of the Insurance Program on an uninterrupted basis and the payment of the Insurance Obligations are essential to preserve and maximize the value of the Debtor's estate.

85. In the ordinary course of business, the Debtor employs Hub, an insurance brokerage firm (the "Broker"), to assist the Debtor in procuring and negotiating elements of the Debtor's

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document      Page 28 of 41

Insurance Program. For Broker-related services, the Debtor pays the Broker's commissions in the ordinary course of business (the "Broker Fees"). The Broker is essential to the Debtor's ability to secure insurance coverage, as it structures and manages the Insurance Program in a reasonable and prudent manner and enables the Debtor to realize considerable savings in the procurement of aspects of the Insurance Program. The Debtor does not have access to certain key markets unless represented by the Broker as of the date hereof. The Debtor believes that it is current in its obligations to the Broker. The Debtor seeks Court authority to continue to employ the Broker in the ordinary course of business and to pay Broker Fees as necessary in connection with procurement and maintenance of the Insurance Program.

86. The Debtor finances certain of its insurance policy premiums through an insurance premium finance agreements (the "Finance Agreement") with First Insurance Funding (the "PFA Lender"). Pursuant to the Finance Agreement, the PFA Lender has agreed to pay the insurance premiums due under certain of the Commercial Insurance Policies in exchange for installment payments totaling $175,000 per installment in the aggregate. The Debtor believes that it is current on amounts due under the Finance Agreement as of the date hereof. In the Debtor's business judgment, the terms of the Finance Agreement represent fair and reasonable terms for financing the premiums of the Commercial Insurance Policies under the circumstances, and the Debtor's estate will benefit by maintaining this relatively low-cost financing from the PFA Lender. Moreover, any interruption of payments might adversely affect the Debtor's ability to obtain financing for future policies on favorable terms, to the extent needed. Thus, the Debtor requests authority to continue honoring its obligations pursuant to the Finance Agreement and to continue the grant of security interests to the PFA Lender. The Debtor believes that it is in the best interest of its estate to honor its obligations under the Finance Agreement. Any other alternative would

likely require considerable cash expenditures and would be detrimental to the Debtor's chapter 11 efforts.

87.     Accordingly, for the reasons stated herein and in the Insurance Motion, I believe the requested relief is appropriate and the Insurance Motion should be approved.

**G.     Expedited Motion of Debtor for Interim and Final Orders (i) Approving Debtor's Proposed Form of Adequate Assurance of Payment; (ii) Establishing Procedures for Resolving Objections and Requests for Additional Assurance from Utility Companies; (iii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (iv) Granting Related Relief (the "Utilities Motion")**

88.     Pursuant to the Utilities Motion, the Debtor seeks, among other things: (a) approval of the Debtor's proposed form of adequate assurance of postpetition payments to the Utility Companies of a deposit (solely for Utility Companies who are not holding any form of deposit or other security) equal to the Debtor's estimated aggregate monthly utility expenses for each Utility Company based on the Debtor's average monthly payments over the last six-month period prior to the Petition Date (the "Estimated Monthly Utility Expense"), less any deposit then held by such Utility Company, with such deposit provided to any requesting Utility Company within 10 days of such request; (b) procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (the "Adequate Assurance Procedures"); (c) a prohibition on the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against the Debtor solely on the basis of the commencement of this chapter 11 case, a debt that is owed by the Debtor for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance pending entry of the Order; and (d) setting a final hearing on the Utilities Motion.

89.     Any disruption of the Debtor's Utility Services would cause irreparable harm to the Debtor's business operation and its estate, as it could result in the Debtor's inability to operate its

business. Without the protections afforded by the Adequate Assurance Procedures, the Debtor could be forced to address *ad hoc* requests by Utility Companies in a disorganized manner in the initial, critical stages of its restructuring process, when its efforts should be focused on stabilizing its operations and maximizing value for all of its stakeholders. The orderly process contemplated by the Adequate Assurance Procedures is necessary for a smooth transition by the Debtor into chapter 11 and will aid in its restructuring efforts. Moreover, the Adequate Assurance Procedures will establish a fair process that will ensure all parties act in good faith.

90. This chapter 11 case simply will not succeed if the Debtor cannot be assured continual and uninterrupted Utility Services. Any disruption of the Utility Services could have a significant impact on the Debtor's business operations and efforts to maximize value for the estate.

91. Accordingly, for the reasons stated herein and in the Utilities Motion, I believe the requested relief is appropriate and the Utilities Motion should be approved.

**H.  Expedited Motion of Debtor for Entry of an Order Granting Additional Time to File Schedules and Statements (the "Extension Motion")**

92. I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtor to file with the Court within 14 days of the Petition Date: (a) its schedules of assets and liabilities; (b) its statement of financial affairs; (c) its schedules of current income and expenditures; (d) its lists of executory contracts and unexpired leases; and (e) its lists of equity security holders (collectively, the "Schedules and Statements").

93. By the Extension Motion, the Debtor is seeking entry of an order extending the time for filing the Schedules and Statements for an additional 14 days (for a total of 28 days from the Petition Date). The Debtor has commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but the Debtor believes that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule

1007(c) is not sufficient to permit completion of the Schedules and Statements.

94. The Debtor is filing the Extension Motion because it has numerous creditors and other interested parties, and the Debtor require additional time to accurately review and report all of the required information. The Debtor estimates that it has more than 4,500 creditors and other interested parties. Given the size and complexity of its business and the fact that certain prepetition invoices have not yet been received and/or entered into the Debtor's financial systems, the Debtor has not had the opportunity to gather all the necessary information to prepare and file its Schedules and Statements. An extension will allow the Debtor to properly prepare this information in an accurate and efficient manner.

95. Accordingly, for the reasons stated herein and in the Extension Motion, I believe the requested relief is appropriate and the Extension Motion should be approved.

       **I.**      **Expedited Motion of Debtor for an Order to Limit Notice and Establish Notice Procedures (the "<u>Limit Notice Motion</u>")**

96. Pursuant to the Expedited Limit Notice Motion, the Debtor seeks entry of an order (a) limiting the notice parties in certain circumstances and (b) establishing notice procedures. The Debtor has identified almost 5,000 persons or entities to which notice must be given under certain circumstances under the Bankruptcy Code, the Bankruptcy Rules, and/or the Local Rules. Providing such notice would be burdensome to the Debtor, costly to the estate, confusing to certain constituencies, and in many cases, unnecessary, given that many motions filed would not have any bearing on the rights of certain parties.

97. Accordingly, the Debtor proposes to create a master service list (the "<u>Master Service List</u>") that would include: (a) the Office of the United States Trustee; (b) the Prepetition Agent; (c) the Junior Prepetition Secured Party; (d) the Internal Revenue Service; (e) the parties included on the Debtor's consolidated list of its 20 largest unsecured creditors or counsel for the

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document      Page 32 of 41

Official Committee of Unsecured Creditors if and when the committee is formed; (f) the United States Attorney for the Middle District of Tennessee; (g) the state attorneys general in states where the Debtor is authorized to do business; (h) all other potentially secured parties; (i) any party that has formally appeared and requested service of papers in these proceedings pursuant to Bankruptcy Rule 2002; and (j) any government agency required to be served by the Bankruptcy Code, the Bankruptcy Rules, and/or the Local Rules, including all applicable taxing authorities.

98.    The Debtor proposes to limit notice of all matters governed by Bankruptcy Rule 2002 in this case to those parties on the Master Service List only, except for notice regarding the following matters: (a) commencement of this case; (b) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code; (c) any deadline for filing proofs of claim pursuant to Bankruptcy Rule 3003; (d) any deadline to object to a disclosure statement or plan of reorganization; (e) any hearing to consider approval of a disclosure statement; (f) a hearing to consider confirmation of a plan of reorganization; and (g) a proposed sale of all or substantially all of the Debtor's assets on a going concern basis.

99.    If a party to the Master Service List is not already receiving CM/ECF notifications, the Debtor further requests authority to serve, in its discretion, any pleadings or papers on the Master Service List by electronic mail in lieu of serving hard copies upon any service parties for which the Debtor has e-mail contact information. For all other parties, the Debtor will serve pleadings and papers by facsimile, hand delivery, overnight delivery service, and/or first-class mail, as may be allowed under the Bankruptcy Code, the Bankruptcy Rules, and/or the Local Rules, and as may be appropriate.

100.    The establishment of the above-described notice procedures will promote the Debtor's bankruptcy efforts by preserving assets that otherwise would be consumed by

Case 3:25-bk-00452    Doc 22    Filed 02/03/25    Entered 02/03/25 21:08:40    Desc Main
Document    Page 33 of 41

unnecessary copying, postage, and related expenses, and the Debtor does not believe that doing so would inappropriately prejudice the rights of any parties in interest. This relief will also mitigate confusion that sometimes results from a creditor receiving bankruptcy pleadings that have nothing to do with such creditor's claim.

101. Accordingly, for the reasons stated herein and in the Limit Notice Motion, I believe the requested relief is appropriate and the Limit Notice Motion should be approved.

**J.** **Expedited Motion of Debtor for Entry of an Order (i) Authorizing the Debtor to Honor and Continue Certain Customer Programs and Customer Obligations, (ii) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (iii) Granting Related Relief (the "Customer Programs Motion")**

102. Pursuant to the Customer Programs Motion, the Debtor seeks entry of an order (a) authorizing, but not directing, the Debtor to honor certain prepetition obligations to the Debtor's customers and to otherwise continue the Customer Programs (as defined in the Customer Programs Motion); (b) authorizing the Debtor's banks to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

103. In the ordinary course of the Debtor's business, the Debtor engages in a number of practices to develop, support, and sustain a positive reputation with its customers and in the marketplace in general to remain competitive on pricing. The Customer Programs are an important component of the Debtor's operations and customer-retention strategy, continuing to honor the Customer Programs described below—including certain prepetition obligations arising thereunder—is necessary to maximize the value of the Debtor's store closing sales and the Debtor's estate for the benefit all creditors and stakeholders in this chapter 11 case.

### (a) Refund and Exchange Program

104. The Debtor maintains a refund and exchange program (the "Refund and Exchange Program") whereby the Debtor allows its customers to return or exchange merchandise at any of

its locations. Under the Refund and Exchange Program, customers generally may return items within 30 days of in-store purchases. Returns require a receipt or other confirmation of proof of purchase and are either refunded in the same method of the original payment, issued as a refund check (collectively, the "Refund Checks"), a store credit, or exchanged for a replacement item.

105.     As part of the Refund and Exchange Program, the Debtor does not believe there are outstanding Refund Checks issued for the period prior to the Petition Date. However, out of an abundance of caution, the Debtor seeks the authority, but not the direction, to honor outstanding Refund Checks for products that were purchased prior to January 30, 2025, or if a customer contacts the Debtor asking for a lost or expired Refund Check to be re-issued, in the event such customer's Refund Check has expired, which is consistent with the Debtor's prepetition practices. For the avoidance of doubt, the Debtor's budget submitted with the Cash Collateral Motion to use cash collateral contemplates that the Debtor will honor returns in the ordinary course of business within the 30-day return period for purchases fulfilled prior to January 30, 2025.

### (b) Gift Card Program

106.     The Debtor previously maintained a program whereby customers could purchase pre-paid gift cards that do not lose value (collectively, the "Gift Cards"). Gift Cards were previously only sold in-store (not online) and may be redeemed for merchandise from the Debtor's stores at a later date.  On or about January 30, 2025, the Debtor ceased selling or issuing Gift Cards.  However, a small number of Gift Cards remain unused and may still be redeemed.  The Debtor estimates that as of the Petition Date, there are approximately $5,500 in issued but unredeemed Gift Cards outstanding.  In the Customer Programs Motion, the Debtor seeks authority to continue honoring its prepetition and postpetition obligations in connection with the Gift Card

Program in a manner consistent with the Debtor's past practices, subject to certain limitations proposed therein, in the ordinary course of business.

### (c) Rewards Program

107.     In the ordinary course of business, the Debtor offers promotional points that can be redeemed as cash in a loyalty program called the "Crazy Clover Club" (the "Rewards Program"). As of the Petition Date, there were approximately 980,000 customers enrolled in the Rewards Program.  Members of the Rewards Program earn one point for every $1 spent.  The Debtor offers three levels: Thrilling, Daring, and Extreme.  At the Thrilling level, members get $1 of Clover Cash for every 50 points earned.  At the Daring level, members get $2 of Clover Cash for every 50 points earned. Lastly, at the Extreme level, members get $3 for every 50 points earned. The total amount of "Clover Cash" that one can earn in a given calendar year is capped at 1,500 points (which is a maximum of $30, $60, or $90 per person depending on the level).    However, the Clover Cash points reset at the beginning of every calendar year, so the Debtor is only one month into the program and are suspending the accrual of points for any purchases that occur on or after January 30, 2025.  The Debtor estimates that members have accrued approximately 7,000,000 points in the aggregate in January 2025.  This translates into approximately $140,000 in the aggregate of potentially redeemable Clover Cash on account of such points.  The Debtor seeks the authority, but not the direction, to honor the Rewards Program if customers wish to redeem their points during this chapter 11 case, which is consistent with the Debtor's prepetition practices.

### (d) Sales Promotion Programs

108.     In the ordinary course of business, the Debtor occasionally conducts sales promotions in-store or by mail (the "Sales Promotion Program"). The Sales Promotion Program includes seasonal discounts, discount codes and coupons, and other promotions. This Customer

Program is an important part of the Debtor's marketing strategy, as it fosters goodwill for the brand, targets captive customers that would otherwise be unlikely to purchase the Debtor's merchandise, helps the Debtor liquidate merchandise, and generates revenue by encouraging sales. By this Motion, the Debtor seeks authority, but not direction, to continue the Sales Promotion Program in a manner consistent with its past practices in the ordinary course of business.

109.    The Debtor estimates that the aggregate value of accrued prepetition payment obligations, discount amounts, processing fees, and other obligations under the Customer Programs is approximately $145,500.  For the reasons stated herein and in the Customer Programs Motion, I believe the requested relief is appropriate and the Customer Programs Motion should be approved.

      **K.**        **Expedited Motion of Debtor for Entry of an Order (i) Authorizing, But Not Directing, Payment of Certain Prepetition Shipping Obligations in the Ordinary Course of Business; (ii) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (iii) Granting Related Relief (the "<u>Shipper Motion</u>")**

110.    Pursuant to the Shipper Motion, the Debtor is seeking authorization, but not direction, to pay to Averitt Transport, Inc. (the "<u>Shipper</u>") certain shipping charges incurred by the Debtor, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtor to the Shipper for services performed and/or goods that were delivered to the Debtor prior to the Petition Date (collectively, the "<u>Shipping Obligations</u>").

111.    The bulk of the Debtor's logistics and shipping between its distribution facility and its retail stores is handled by the Shipper, who is currently owed approximately $1.3 million on account of prepetition Shipping Obligations. The Debtor will continue to need to utilize the Shipper's services for the continued transfer of merchandise postpetition.  Indeed, the Debtor

requires the continued shipment of goods to its retail locations in order to continue to maximize value of its store closing process.

112.    While the Debtor cannot (and is not seeking to) pay the entirety of the Shipper's prepetition balance of the Shipping Obligations, subject to the Shipper's agreement to maintain continued delivery of product over the coming weeks, the Debtor is proposing to pay the Shipper an amount equal to 150% of the value of any valid postpetition invoice issued by Shipper, such that any amount above the face value of the valid postpetition invoice shall be applied to the Shipper's prepetition balance of the Shipping Obligations. The Debtor requests the authority, but not the direction, to pay up to $300,000 in the aggregate on account of the Shipper's prepetition Shipping Obligations through the postpetition overpayment.

113.    The Debtor believes that, as of the Petition Date, the Shipper is holding merchandise that was scheduled to be delivered prior to the Petition Date.  Because the Debtor's business depends on the continued supply of inventory to its retail locations, even minor disruptions in the shipping process could be disastrous for the Debtor's store closing liquidation process.

114.    I believe that the failure to pay the Shipper certain prepetition Shipping Obligations as proposed in the Shipper Motion will result in irreparable harm to the Debtor's store closing process and hinder the Debtor's ability to maximize value for its stakeholders.  Moreover, the Debtor represents that it will only pay Shipping Obligations where it believes, in its business judgment, such payment benefits to its estate and creditors because making such payments would exceed (a) the costs that the estate would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions.

115. Accordingly, for the reasons stated herein and in the Shipper Motion, I believe the requested relief is appropriate and the Shipper Motion should be approved.

**L.      Expedited Motion for Entry of an Order Setting a Hearing on First Day Motions (the "Expedited Hearing Motion")**

116. The First Day Pleadings described above involve matters that require an emergency and expedited hearing and the Debtor is requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing as soon as the Court's schedule will permit and no later than February 6, 2025, and that the Court approve the form of notice thereof.

117. The relief requested in the Expedited Hearing Motion is necessary to obtain expedited relief on the First Day Pleadings. As described in detail in each of the First Day Pleadings, the expedited relief requested in the First Day Pleadings is essential to: (i) use cash collateral; (ii) ensure a smooth transition into chapter 11; (iii) maintain the Debtor's operations and business throughout this chapter 11 case; and (iv) efficiently administer the bankruptcy estate. The Expedited Hearing Motion and the First Day Pleadings are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtor's operations and its transition into operating as chapter 11 debtor in possession.

118. Pending entry of an order approving the Expedited Hearing Motion, the Debtor proposes to serve the "Notice of Expedited Hearing on First Day Motions," which is attached as Exhibit A to the Expedited Hearing Motion, as soon as possible to the various notice parties identified in the Expedited Hearing Motion, including each party whose rights are affected by the First Day Pleadings.

119. Accordingly, for the reasons stated herein and in the Expedited Hearing Motion, I believe the requested relief is appropriate and the Expedited Hearing Motion should be approved.

## IV. <u>**CONCLUSION**</u>

120.     For the reasons stated herein, and in each of the First Day Pleadings filed concurrently or in connection with this chapter 11 case, the Debtor respectfully requests that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  February 3, 2025

*/s/ Rob Hubbard*
Rob Hubbard, Chief Restructuring Officer
Essex Technology Group, LLC